IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Madelyn Wilkinson,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>I.Q. Data International, Inc.,<br><br>　　　　Defendant. | Case No. 3:21-cv-50413<br><br>Honorable Iain D. Johnston |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Madelyn Wilkinson brings this action against I.Q. Data International, Inc. ("I.Q. Data") for alleged violations of her rights under the Fair Debt Collection Practices Act (FDCPA) and the Illinois Consumer Fraud Act (ICFA). The claim stems from phone calls between I.Q. Data and Wilkinson in which I.Q. Data attempted to collected on a debt Wilkinson owed her former landlord. Wilkinson asserts that the I.Q. Data employees she spoke with were rude, harassing, and improperly charged her bank account. I.Q. Data now moves the Court to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) for lack of jurisdiction and failure to state a claim. The Court need not address the Rule 12(b)(6) argument, however, because Wilkinson lacks Article III standing to bring this action in federal court. Thus, the motion to dismiss the FDCPA claim for lack of jurisdiction [51] is granted, and the Court declines to exercise supplemental jurisdiction over Wilkinson's claim under the Illinois Consumer Fraud Act.

1

## I. Legal Standard

Federal Rule of Civil Procedure 8 requires that a plaintiff's complaint need only allege a short and plain statement establishing the basis for the claim and the Court's jurisdiction, as well as prayer for the relief sought. Fed. R. Civ. P. 8(a). According to the Supreme Court, this means that the complaint's factual allegations, rather than any legal conclusions, must raise the plausible inference that the defendant is liable for the misconduct complained of. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Because a motion to dismiss under Rule 12(b)(6) challenges the sufficiency of a complaint's allegations, the Court is typically limited to reviewing the complaint's factual allegations. Indeed, the defendant, as the moving party, bears the burden of establishing that the complaint's allegations, taken as true, are insufficient. *Marcure v. Lynn*, 992 F.3d 625, 631 (7th Cir. 2021). But the incorporation by reference doctrine "prevents a plaintiff from avoiding dismissal by omitting facts or documents that undermine his case." *Fin. Fiduciaries, LLC v. Gannet Co.*, No. 21-2016, 2022 U.S. App. LEXIS 23418, at *12, __ F.4th __ (7th Cir. Aug. 22, 2022).

Courts may consider evidence attached to the defendant's motion to dismiss if it is (1) referenced in the plaintiff's complaint, (2) concededly authentic, and (3) central to the plaintiff's claim. *Id.* Central to Wilkinson's case is the conduct of I.Q. Data's employees during phone calls they had with Wilkinson in which they attempted to collect on the debt. In its motion to dismiss, I.Q. Data attached the transcripts from those calls, which were recorded, and argued that the Court should

consider them on the motion to dismiss based on the incorporation by reference exception. Dkt. 52, at 5. Wilkinson does not dispute that the transcripts can be incorporated by reference. Indeed, her complaint necessarily discusses the conversations detailed in the transcripts because they are undisputedly central to her claim. Rather, she questions why I.Q. Data attached transcripts, rather than the actual recordings, and contends that the tone of the conversations would offer a fuller picture into the alleged harassment. Dkt. 54, at 2–3, & n.1 ("However, those transcripts are largely consistent with the nature of Plaintiff's allegations, with the only difference being the self-serving lens through which Defendant views those conversations."). Thus, the Court will include the transcripts of the relevant phone calls into its analysis of the sufficiency of the complaint's allegations. Nonetheless, the Court will interpret those transcripts in the light most favorable to Wilkinson. The Court recognizes that tone of voice matters, and because the defendant has not attached the actual recordings, the Court accepts as true the allegation that I.Q. Data employees took harsh tones with Wilkinson during these calls. In the end, the difference is inconsequential because the Court's opinion would not change regardless of the tone that these individuals took.

## II. Background

Plaintiff Madelyn Wilkinson was a resident at the Clayson Apartments. During the Covid-19 pandemic, she lost her job and was no longer able to pay her rent. Later, on January 13, 2021, Clayson Apartments sent her debt to I.Q. Data, which is a collections agency, to attempt to collect the debt.

<u>January 19 phone call</u>

On January 19, 2021, an I.Q. Data employee called Wilkinson to attempt to collect the debt. The caller informed Wilkinson that she owed a total of $5,061.63. When Wilkinson stated that she had lost her job the previous June, the caller inquired further about Wilkinson's financial situation. She asked where Wilkinson was working, how much she was earning, at what frequency she was paid, what she did at the new job, and how much she paid each month in rent. She then asked whether Wilkinson had any money in savings. Wilkinson responded that she had a $30,000 debt from medical bills and had no savings.

The I.Q. Data caller then asked about other options, including whether Wilkinson could borrow money from family and friends, and whether Wilkinson could charge the debt to a credit card. Wilkinson explained that she would not be transferring the debt to a credit card. The I.Q. Data employee then responded, in what reads as an aggressive tone: "You're the one who just – you just verified where you're currently working, so if you don't take care of this we're going to go ahead and move forward against you, and it's going to make it harder to pay all your other bills, which it doesn't look like you have any bills, so you should be able to apply something towards the balance." Dkt. 52-1, at 3. The reasonable inference in this statement is that I.Q. Data would attempt to garnish Wilkinson's wages if she failed to pay the debt. Wilkinson then asked about a monthly payment, and the employee explained that the full balance was due, and that I.Q. Data was "not in the business of financing your debt." *Id.* Wilkinson then hung up the phone.

Wilkinson views this phone call as harassing and aggressive. She believes the employee was merely reading from a script that is intentionally designed to harass and abuse customers into paying their debts after being asked to give up sensitive personal information. Furthermore, because I.Q. Data did not act on its perceived threats to take further action against her, Wilkinson sees the threat as false, illusory, and harassing. Notwithstanding that I.Q. Data did not take direct action, they continued calling Wilkinson in the following months.

<u>September 13 phone calls</u>

Wilkinson alleges that I.Q. Data continued calling over the next few months, but the next time she alleges that she spoke on the phone with them was September 13, 2021. By this time, the debt had increased to $5,225.17 because of interest charges. Notwithstanding that the previous I.Q. Data employee had told Wilkinson that no payment options were available, the employee that called this time offered a payment plan. The option required Wilkinson to pay a twenty percent down payment, with recurring payments to follow. The employee also offered Wilkinson a settlement of $4,500 to take care of the bill instead of the full amount if she were able to pay in the month of September. Wilkinson declined because she said she didn't have the money. So, the employee explained that Wilkinson would have to pay the twenty percent and make subsequent payments. In response, Wilkinson asked if she could just pay nothing and allow it to remain on her credit. The employee agreed: "Or you can do that as well, ma'am, if you don't care about it. Honestly, I can't care about it more than you do. This is your account and you owe

5

this account, not me." Dkt. 52-2, at 3. Wilkinson then questioned why she needed to make a down payment at all. She then explained that she would call I.Q. Data back if she ever got the money, but the I.Q. Data employee hung up on Wilkinson before Wilkinson could finish her sentence.

Wilkinson felt frustrated and belittled by the way she was treated, so she called back to express her frustration and ask that she no longer be contacted by telephone. She wanted all future communications to be in writing. The I.Q. Data employee that answered the phone explained that Wilkinson can't just "call and randomly talk to whoever answers the phone. I will transfer you." Dkt. 52-3, at 3. After being placed on hold for the purported transfer, Wilkinson was hung up on again. This infuriated Wilkinson, and so she called back again.

This time, the individual who answered appears to have been more helpful and professional. He explained that I.Q Data could cease the calls, but that it would not resolve her account. He asked if she was experiencing a hardship and told her the company wasn't there "to slam the door on you, and I'm sorry it got off on the wrong foot." Dkt. 52-4, at 3. Wilkinson then asked if he could take $500 as a down payment instead of the $1,000 that the previously employee had required. After a pause, in which he apparently had to check on what the client required, he returned and offered her a payment plan that included a $500 down payment and recurring payments thereafter. He further explained that she had two accounts, not one, and that the amount she had been quoted included both accounts. She then gave him

6

her payment information, and the call concluded in what appears to have been a cordial transaction. *Id.* at 4 (page eight of the transcript).

Notwithstanding the positive language used in this phone call, Wilkinson alleges that "this is emblematic of a 'good-cop, bad-cop' strategy employed by Defendants, wherein Defendant causes consumers to be so mistreated by some of its collectors that such consumers are more willing to cooperate with the collectors who treat them with any modicum of respect." Dkt. 43, ¶ 52. Furthermore, although Wilkinson requested a stop to the purportedly harassing phone calls, I.Q. Data continued calling her.

October 14 phone call

Wilkinson then called I.Q. Data on October 14, 2021, to completely resolve the matter. She wanted to pay off the full balance of her debt, which at this point had increased to $5,246.55. So, she again provided her payment information and authorized the payment. Dkt. 52-5, at 3 ("Okay. Yes. We can go ahead and do the full amount."). The payment did not go through, however, because Wilkinson's bank was blocking the transaction. *Id.* ("It says the bank is blocking the transaction. They could think it's fraudulent."). The I.Q. Data employee then explained that he could set the payment up to go through the next day but that Wilkinson would need to call the bank and get the issue sorted out or it would just be declined again. Wilkinson agreed but wanted to ensure the payment would be scheduled for the next day: "Okay. That's so weird. Let me give them a call and then, yeah, if you could just set up for it to be taken out tomorrow. If I don't have to call back that will

7

be great because I'm always at work." Because Wilkinson had two accounts, they appear to have processed a payment for the lesser amount, leaving a balance of just over $4,000. The I.Q. Data employee then again explained that the first payment probably didn't go through because of the large amount. He then asked her to give her bank a call and then to call him back. Wilkinson sees the following exchange as an agreement that the card would not be charged unless she called I.Q. Data back to authorize the payment:

> I.Q. Data: . . . I would just give them a call and call back to run the payment.
>
> Wilkinson: Okay. But it did set up then. It will happen tomorrow once I call it will come out?
>
> I.Q. Data: Well, because they're blocking it today they're going to block it again tomorrow, so you'll have to give them a call and call us back today.
>
> Wilkinson: So I have to call back anyways to make sure that it goes through?
>
> I.Q. Data: Yeah, that is correct.

Dkt. 52-5, at 3. Wilkinson views this interaction as requiring her to call back before the payment would be authorized, notwithstanding that she began the call by telling the I.Q. Data employee that she wished to pay the amount in full and then subsequently authorized the payment to be made in full. Thus, Wilkinson alleges that "Defendant withdrew funds from Plaintiff's account, despite Plaintiff not finalizing that payment in the manner required by the parties' agreement." Dkt. 43, ¶ 71.

Wilkinson alleges that these interactions frustrated and confused her, and that I.Q. Data's conduct was harassing and unfair. She alleges that she experienced emotional distress, anxiety, aggravation, and that she lost funds for a time because of the purportedly unauthorized withdrawal. *Id.* ¶¶ 73–76. Based on these events, Wilkinson alleges that I.Q. Data violated the FDCPA, specifically sections 1692c(a)(1), 1692d, 1692e, and 1692f.

Congress passed the Fair Debt Collection Practices Act in part "to eliminate abusive debt collection practices by debt collectors" and to ensure "that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged." 15 U.S.C. § 1692(e). Wilkinson alleges that I.Q. Data's conduct violated section 1692c(a)(1), which prohibits debt collectors from contacting consumers at unusual times or in unusual places that are known to be inconvenient to the consumer. Wilkinson next asserts that I.Q. Data violated section 1692d, which prohibits conduct that has the natural consequence of harassing, oppressing, or abusing the debtor. She further claims that I.Q. Data violated section 1692e, which prohibits debt collectors from using false, deceptive, or misleading means to collect any debt. Lastly, Wilkinson claims that I.Q. Data's conduct violated section 1692f, which generally prohibits the use of unfair or unconscionable means to collect or attempt to collect any debt.

### III.     Wilkinson lacks Article III standing

To satisfy Article III's standing requirement, a plaintiff must allege (1) an injury in fact, (2) that is fairly traceable to the defendant's allegedly wrongful

9

conduct, and (3) the relief sought must redress the harm allegedly caused. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). The element of standing at issue here, as is often the case, is whether the plaintiff has suffered an injury in fact. An injury in fact is the invasion of a legally protected interest that is both concrete and particularized to the plaintiff. It must be real, not abstract, and it must have either already occurred or (if injunctive relief is sought), it must be certainly impending. *Spokeo, Inc. v. Robins*, 587 U.S. 330, 339 (2016); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

Because the harm in question was particular to the plaintiff, and has already occurred, the only question is whether the alleged harm was sufficiently concrete. Importantly, both tangible and intangible harms may be concrete depending on the circumstances. *TransUnion v. Ramirez*, 141 S. Ct. 2190, 2205 (2021) ("Various intangible harms can also be concrete. Chief among them are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts."). The Seventh Circuit has issued a significant number of opinions regarding the concreteness of intangible harms in FDCPA cases in recent years.

In *Wadsworth v. Kross, Lieberman & Stone, Inc.*, 12 F.4th 665 (7th Cir. 2021), the plaintiff asserted that Kross failed to provide her the appropriate notice of her rights, in violation of section 1692(g)(a). She also alleged that Kross' employee never identified herself as a debt collector, in violation of sections 1692d and 1692e. But Wadsworth alleged only that she suffered "personal humiliation, embarrassment, mental anguish and emotional distress," as well as intimidation, worry, and a

10

reduced ability to sleep. *Id.* at 668. The Seventh Circuit unequivocally rejected these emotional harms as being insufficient to establish a concrete injury in FDCPA cases:

> As our bevy of recent decisions on FDCPA standing makes clear, anxiety and embarrassment are not injuries in fact. Indeed, we have expressly rejected 'stress' as constituting concrete injury following an FDCPA violation. Likewise, it is not enough for a plaintiff to be 'annoyed' or 'intimidated' by a violation. Nor is it enough for a plaintiff to experience 'infuriation or disgust' or 'a sense of indignation.' . . . These are quintessential abstract harms that are beyond our power to remedy.

*Id.* (citations omitted). That is not to say that all FDCPA cases are doomed in federal court, where Article III applies. In *Ewing v. Med-1 Solutions, LLC*, the Seventh Circuit held that the plaintiff had standing because the statutory violations caused the plaintiff's credit score to decline, which is analogous to reputational harms commonly recognized in American courts. 24 F.4th 1146, 1149–50 (7th Cir. 2022).

But *Ewing* is the exception that makes the Seventh Circuit's point, which is simply that a violation of the FDCPA unaccompanied by a concrete injury is not enough to pass constitutional muster. In *Spuhler v. State Collection Serv.*, the plaintiffs argued that the debt collector's dunning letters were unfair and misleading because they didn't explain that the debts would continue accruing interest. 983 F.3d 282, 286 (7th Cir. 2020). The court rejected the argument because no concrete injury resulted from the allegedly unfair and misleading communication. *Id.* And in *Larkin v. Finance Sys. of Green Bay, Inc.*, 982 F.3d 1060, the plaintiff alleged that Finance System sent her a letter that she believed to be

11

unfair, unconscionable, and misleading in violation of the FDCPA: "You want to be worthy of the faith put in you by your creditor . . . . We are interested in you preserving a good faith rating with the above creditor." *Id.* at 1063. Other plaintiffs had received similar letters. But because the plaintiffs did not allege any concrete injury stemming from these alleged violations, the Seventh Circuit held they lacked Article III standing. *Id.* at 1066–67. The court noted, for example, that the plaintiffs had not paid "debts they did not owe" and had not alleged they would have "pursued a different course of action were it not for the statutory violations." *Id.* at 1066.

      In this case, Wilkinson has not alleged any concrete harms stemming from I.Q. Data's purported violations or her rights under the FDCPA. She analogizes her alleged harms to those recognized in American courts through intrusion upon seclusion actions. She says she suffered emotional distress, anxiety, aggravation, and frustration. But as already explained, the Seventh Circuit has already rejected these harms as insufficient under Article III for FDCPA actions. She also alleges that she lost time as result of I.Q. Data's actions, but if that were enough, then every FDCPA plaintiff would have standing to sue due to lost time in answering calls from debt collectors. Lastly, Wilkinson alleges that I.Q. Data inappropriately withdrew funds from her account before she called them back to authorize the payment. The incorporation by reference doctrine, however, allows the Court to analyze the transcripts from the call in question because Wilkinson spoke at length about it in her complaint and it is central to her claim. The transcript establishes that Wilkinson called I.Q. Data with the stated purpose of paying off her debt in

12

full. She even made a point to confirm that the funds would be withdrawn without her having to call back because she would likely be at work. The I.Q. Data employee, not Wilkinson, was the individual that asked Wilkinson to call back just to confirm that her account had been satisfied in full. The allegation that I.Q. Data waited a couple of days longer to charge the card is of no consequence—she has not alleged how the delay harmed her in any way. Because the plain language of the transcript establishes that Wilkinson authorized the payment, she has not sufficiently alleged that she would have done anything differently if I.Q. Data had not charged her card. Indeed, paying the full balance was the expressly stated purpose of her interaction with I.Q. Data on October 14, 2021.

Therefore, Wilkinson has not alleged a concrete injury sufficient to confer subject-matter jurisdiction on this court, so the Court grants I.Q. Data's motion to dismiss.

## IV.     Conclusion

For these reasons, I.Q. Data's motion to dismiss [51] is granted. The dismissal is without prejudice. Wilkinson may amend her complaint by September 23, 2022, if she believes she can plausibly allege a concrete injury consistent with this opinion and her obligations under Federal Rule of Civil Procedure 11. If she declines the opportunity to amend, her leave to amend will be withdrawn after that date and this action will be terminated. Alternatively, she may stipulate to dismissal without prejudice so that she can refile this action in the appropriate state court. If she is unable to plausibly allege a concrete injury sufficient to satisfy

the Seventh Circuit's recent flurry of standing cases, then the Court will decline to exercise supplemental jurisdiction over her state law claim. *Al's Serv. Ctr. v. BP Prods. N. Am., Inc.*, 599 F.3d 720, 727 (7th Cir. 2010).


Date: September 7, 2022

_____
Honorable Iain D. Johnston
United States District Judge